**Entered on Docket
January 25, 2006**

_____
**Hon. Bruce A. Markell
United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

* * * * * *

In re:                                    )          Case No.: BK-S-04-18335-BAM
                                          )          Chapter 11
ASTON-NEVADA LIMITED                      )
PARTNERSHIP,                              )
                                          )
            Debtor.                       )
                                          )          Date:   June 17, 2005
                                          )          Time:   9:30 a.m.
                                          )
_____ )

**OPINION REGARDING SANCTIONS**

This matter is before the court on an order to show cause as to why the law firm of Harris Merritt Chapman, Ltd. (HMC) and one of its partners, Scott E. Chapman, should not be sanctioned for their actions in this case. After extensive briefing and one-half day of testimony, the court concludes that the lawyers' conduct is this case was aggressively reckless as well as being suffused with bad faith. The court therefore orders sanctions as set forth below.

**I. Summary of Case**

Aston-Nevada Limited Partnership, the debtor in this case, had one asset: a 1999 Porsche 911. The ultimate owner of Aston-Nevada, Kerry Rogers, drove this

1  Porsche.[1]  Rogers owed money to Silver State Bank (SSB), and had used his control of

2  Aston-Nevada to cause it to give SSB a security interest in the Porsche to secure

3  Rogers' personal debt.

4          After much wrangling between SSB and Rogers over Rogers' repayment of

5  his debt to SSB, the bank filed a lawsuit in state court against Rogers and Aston-

6  Nevada.  In an effort to force Rogers and Aston-Nevada to surrender the Porsche to

7  SSB, SSB had scheduled a hearing for that purpose for Monday, August 2, 2004.  On

8  July 30, 2004, the Friday before the state court hearing, Rogers caused Aston-Nevada

9  to file a chapter 11 petition, essentially staying the Monday hearing in state court.

10  Rogers signed the bankruptcy petition on behalf of Aston-Nevada. He did so without

11  the assistance of counsel, but with the help of Phillip LeVillier.[2]

12          Rogers listed SSB as Aston-Nevada's sole creditor on its required list of

13  creditors.  SSB immediately moved to lift the automatic stay in order to continue its

14  collection action.  Rogers then hired HMC, through Chapman, to represent Aston-

15  Nevada.[3]

16

17  ───────────────

18  [1]Aston-Nevada's sole general partner is an entity called Gortek, LLC. Rogers is the manager

19  of Gortek and apparently owns all of its outstanding interests.

20  [2]LeVillier is a lawyer who signed Aston-Nevada's petition as a bankruptcy petition preparer.
   He is not licensed in Nevada.

21  [3]After this retention, Rogers and LeVillier also retained HMC, and Chapman was the primary

22  lawyer representing their interests.  In discussing the events set forth in text and in discussing the
   responsibility for them, this opinion uses HMC's and Chapman's names  interchangeably, because

23  Chapman acted as HMC's agent throughout, and HMC has not repudiated any of his actions.

24  Considering both parties as one for sanctions purposes is consistent with the manner in Rule 9011
   apportions the responsibility for sanctionable activity. FED. R. BANK. P. 9011(c)(1)(A) (last sentence).

25

2

1    At the relief from stay hearing, this court found that the debtor had only one

2    asset and that the debtor had no equity in that asset.    After reviewing the

3    circumstances that led to Aston-Nevada's filing, the court also found that Aston-

4    Nevada had filed its chapter 11 case in bad faith.   The stay was lifted, and Aston-

5    Nevada did not appeal that ruling.

6    Given the pendency of the state court action, this court, however, declined

7    SSB's request to order Aston-Nevada to turn over the car.   The bank then requested

8    an order under Bankruptcy Rule 2004 to examine Aston-Nevada's "person most

9    knowledgeable" in order to locate the car and to ensure that it was insured.  The court

10   entered an order authorizing such an examination.   Represented by Chapman,

11   LeVillier – but not Rogers – then appeared at the examination.   Neither of them,

12   however, possessed or gave any relevant information about the car.

13   In the meantime, Chapman had tried to dismiss Aston-Nevada's bankruptcy

14   case without notice or a hearing.   Almost a month after filing the first application to

15   dismiss, Chapman filed and served a more extensive motion to dismiss.  That motion

16   was granted on October 7, 2004, subject to the resolution of a sanctions motion that

17   had been brought in the interim by SSB against Aston-Nevada, Rogers, and LeVillier

18   (but not Chapman or HMC).

19   The sanctions motion was hard fought.   Chapman and HMC defended the

20   propriety of Aston-Nevada's original filing, in part by adopting Rogers' theory that

21   SSB was engaged in a conspiracy to take the Porsche for less than its fair value.

22   Chapman also advanced a theory that the chapter 11 had been filed to obtain the

23   intervention of a neutral chapter 11 trustee, although he never took any action to have

24   such a trustee appointed.

25

3

1   This court granted the sanctions motion on March 21, 2005.  The order

2   required Aston-Nevada, Rogers, and LeVillier to pay SSB $12,108.50 as sanctions. This

3   amount represented SSB's additional costs resulting from Aston-Nevada's chapter 11

4   filing.  That ruling has not been appealed, and this Court does not know whether the

5   sanctions have been paid.

6   During the consideration of SSB's sanctions motion, however, the court

7   became concerned with the actions of HMC and Chapman.  As a result, when it

8   entered the order imposing sanctions on the principals, the court entered a separate

9   order to show cause as to why HMC and Chapman should not also be sanctioned

10  under either Bankruptcy Rule 9011 or the court's inherent power to regulate practice

11  before it. The order referred to the memorandum opinion regarding sanctions and the

12  issues it raised.  The order also contained a briefing schedule, which resulted in

13  significant filings and a half-day hearing on June 17, 2005.  At the hearing, one

14  character witness for HMC testified,[4] as did two of HMC's partners.  The court then

15  took the matter under submission.

16  **II.  The Details:  HMC's and Chapman's Role**

17  *A.    Retention*

18  According to Chapman, he first met with Rogers on August 19 or 20, 2004,

19  less than a week before the August 24 relief from stay hearing. By that time, Aston-

20  Nevada had filed schedules that indicated that it had only one asset – the Porsche.

21

---

22  [4]HMC attempted to have the witness qualified as an expert in bankruptcy litigation, but upon

23  *voir dire* the court learned that he had appeared in only about twenty bankruptcies in a thirty-year

24  career.  The witness was thus unable to testify as an expert as to the level or quality of practice in

    bankruptcy court. The court did, however, permit him to testify as to the reputation of Chapman and

25  the other lawyers of HMC, as he had previously employed some of HMC's lawyers.

4

1   The meeting lasted a little over an hour.  Chapman's testimony at the June hearing on

2   this matter was vague as to what specific matters were discussed, but he apparently

3   received what he thought was sufficient information to formulate an opposition.[5]

4          B.    *Relief From Stay Response*

5          Chapman filed Aston-Nevada's opposition to the relief from stay motion on

6   Monday, August 23.    The opposition focused primarily on SSB's alleged

7   noncompliance with local rules requiring parties to meet and attempt to settle such

8   motions before they are filed,[6] indicating that Chapman had at least discussed the

9   history of the case with Rogers and had inquired about the communications between

10  Rogers and SSB.[7]  Based upon this history, the opposition asserted that SSB "has made

11  an affirmative effort to circumvent the rules and provisions of the bankruptcy code

12  and the local rules," presumably a reference to the local rules regarding settlement

13  discussion before filing a motion seeking relief from the automatic stay.  In support

14  of this assertion, HMC attached correspondence between Rogers and SSB under which

15

16

17

18          [5]In a separate disclosure, HMC revealed that Chapman also had Rogers sign a retainer

19  agreement under which, among other things, HMC agreed "to prepare motions pursuant to 11 U.S.C.
    522(f)(2)(A) for avoidance of liens on household goods on behalf of Aston-Nevada."  This clause is
    puzzling; Aston-Nevada, as a limited partnership, could not have brought a lien avoidance action

20  under Section 522(f) since non-individual debtors cannot claim exemptions, 11 U.S.C. § 522(b).

21          [6]Local Bankruptcy Rule 4001(a)(5) for the District of Nevada requests the moving party on

22  a relief from stay motion to attempt to confer with debtor's counsel at least two business days before
    filing its motion and to make a sincere effort to settle.

23          [7]In response to the initial sanctions motion, Chapman filed papers in which Rogers asserted

24  that counsel for SSB was not professional and had engaged in a vendetta against him.  The court
    previously found that these statements were not believable.

25

Rogers refused to turn over the Porsche except on Rogers' terms – correspondence that Chapman and HMC could have obtained only from Rogers.

The opposition also resisted relief on substantive grounds.  HMC's pleading affirmatively stated that Aston-Nevada's filing was made "to effectuate the intent of chapter 11" by allowing Aston-Nevada "to negotiate and resolve debts with creditors and provide the debtor with the ability to reorganize its debts as well as its assets." The opposition also disputed SSB's valuation of the Porsche, although its proffered counter-valuation still left Aston-Nevada with no equity in the vehicle.[8]  While HMC did not concede that the Porsche was the only asset of the estate, it did state that "[a]llowing Silver State Bank to possess this vehicle or lift stay to pursue this vehicle would not effectuate a reorganization in this case."[9]

At the relief from stay hearing, Chapman requested a continuance, which was denied.  On the merits, the court found that Aston-Nevada had but one asset and but one creditor, and that it had no equity in that one asset.  It also found that Aston-Nevada's bankruptcy case had been commenced in bad faith.  Relief from stay was granted.  Aston-Nevada did not appeal from this order.

---

[8]The relief from stay motion asserted a secured debt in excess of $55,750.  Not only did Aston-Nevada not contest SSB's secured status, it did not contest the amount of the debt.  It did contest the value of the car, but the highest value it placed on the Porsche was $46,525, an amount some $9,225 below SSB's secured debt, leaving no equity whatsoever for Aston-Nevada.

[9]All of this information apparently came directly from Rogers.  At the June 2005 hearing, Chapman testified that before filing the opposition, he did not check the docket for Aston-Nevada's case, nor did he review its petition or schedules.

1

       *C.    Misguided Application to Dismiss*

2

       The day after the court granted SSB's relief from stay motion, Chapman filed

3

an "application" to dismiss the case.  He did not, however, serve the application on

4

SSB[10] and he did not obtain a hearing date on the motion, as required by Local

5

Bankruptcy Rule 9014(b)(1).  The application was fatally flawed and contained

6

numerous nonsensical references.  Despite Aston-Nevada's status as a limited

7

partnership in chapter 11, HMC's pleading stated that the debtor was "qualified to

8

request dismissal of this case under § 707(b) [*sic*] of the United States Bankruptcy

9

Code, in that I [*sic*] no longer need the protection of this Court."  The application also

10

sought dismissal "without prejudice."[11]

11

       *D.    The Rule 2004 Examination*

12

       On August 27, 2004, after receiving relief from stay, SSB requested and

13

received an order under Bankruptcy Rule 2004 allowing it to take an examination of

14

the "person most knowledgeable" at Aston-Nevada regarding the location and status

15

of the Porsche.  The order indicated that the examination would be broad, and further

16

required production of documents "relating to the 1999 Porsche . . . including, but not

17

limited to, registration papers, insurance, location, etc."  That examination was held

18

---

19

20

       [10]Or at least HMC never filed a certificate of service with respect to the application.  SSB learned of it, and on September 17 it filed an opposition based on Aston-Nevada's failure to seek dismissal through a noticed motion.

21

22

23

24

       [11]It is unclear what such a phrase means in the context of a bankruptcy petition, but in regular civil litigation the addition of "without prejudice" to an order of dismissal allows a plaintiff to later file a complaint containing the same allegations as the dismissed complaint without running afoul of claim or issue preclusion.  Chapman's addition of the phrase to the application was an attempt to evade the court's previous finding of bad faith, and to allow Aston-Nevada another opportunity to file a bankruptcy case.

25

on Thursday, September 16, 2004, after one postponement to accommodate Rogers' schedule.

At best, the examination was a farce. Rogers did not appear, for reasons never adequately explained.[12] LeVillier appeared instead. HMC, through Chapman, represented him and Aston-Nevada. Although LeVillier had knowledge of some of Aston-Nevada's past activities, his most recent contact with Aston-Nevada had been in 2003, more than a year before its bankruptcy filing.[13] LeVillier acknowledged that Aston-Nevada's only asset was the Porsche, but he then testified that he did not know where the Porsche was or whether it was registered or insured. His only relevant testimony about the Porsche was that he had seen Rogers driving it the day before.[14]

---

[12]His principal explanation, which appeared in paragraph 56 of his declaration in opposition to sanctions, was that "other business prevented me from attending."

[13]In response to the question "What do you do for Aston-Nevada?," LeVillier's response was "Nothing." When asked, "What was the purpose of filing the Chapter 11 bankruptcy case?," his response was, "I don't know." When asked, "Did you know that I was going to ask about the Porsche today?," LeVillier responded, "Yes, sure." But to the follow-up question, "And you have no knowledge of the Porsche, where it's located, do you?," he responded, "No."

[14]The maddening nature of the examination is exemplified by the following:

Q:    You're obviously not the person most knowledgeable because you don't have any information about anything. You can tell me there's a car, I know that. Is there anything else you can tell me?

A:    There's a car, it's here, he has it.

Q:    [You d]on't know if it's registered currently; is that correct?

A:    No, I don't.

(continued...)

8

E.    *Filing the Motion to Dismiss*

By September 20, 2004, Chapman and HMC realized that their application to dismiss was ineffective. On that date, they filed a motion to dismiss, which was properly served. This motion principally relied on the assertion that Aston-Nevada had never received a chance to reorganize because of the quickness with which SSB's relief from stay motion had been granted. In making this case, the pleading incorporated many of the same statements used in the opposition to the motion for relief from stay. In particular, the pleading reiterated the false statements that Aston-Nevada had "assets" and "creditors," and that its filing had been made by Rogers to allow Aston-Nevada time to negotiate with these "creditors."

In a somewhat contradictory fashion, HMC and Chapman then conceded that "after exhaustive investigation," Aston-Nevada possessed only one asset, the Porsche, even though the court had already made such a finding almost a month earlier. HMC's papers also stated that "the Debtor cannot really effectuate a plan with only one asset and one creditor."

Nevertheless, HMC and Chapman continued their efforts to cast SSB as the villain, by attaching correspondence between the parties indicating that SSB was not inclined to negotiate, and wanted payment in full or the car. A conspiracy against

[14](...continued)

Q:    Do you know if it's insured?

A:    No, I can't testify to that, no.

Q:    Do you know if there's any body damage, if it's in poor condition or good condition?

A:    It looked fine when I saw it [yesterday]. It looked like it had been freshly washed. Pretty car. It's one that definitely catches your eye if you like cars.

9

Rogers was proffered as Aston-Nevada's motivating reason for filing its bankruptcy filing.[15]

> F.    *Response to SSB's Motion for Sanctions*

SSB agreed that the case should be dismissed. Before dismissal, however, it requested sanctions under Rule 9011 against Aston-Nevada, LeVillier, and Rogers (but not HMC or Chapman), and it further requested that the court retain jurisdiction to hear the sanctions motions if the case were later dismissed.

HMC, through Chapman, strenuously objected to the sanctions. In their opposition, they again put forward Rogers' conspiracy theory, and they also again put forward the theory that since relief from stay had been granted, there was no need for sanctions since SSB had received what it wanted. They defended their conduct and the conduct of their clients at the Rule 2004 examination, essentially contending that the client had the exclusive call as to who was the "person most knowledgeable," and that LeVillier had met that description.

After deliberation, the court found Rogers, LeVillier, and Aston-Nevada liable for sanctions under Rule 9011 and under the court's inherent powers. In particular, the court noted that Aston-Nevada's filing was a classic example of a bad faith filing, and that the conduct in selecting and presenting LeVillier as the "person most knowledgeable" was a separate example of bad faith. Rogers' conspiracy theory was completely discounted. The court imposed monetary sanctions of $12,108.50, the amount of SSB's attorneys' fees and costs.

---

[15]The court completely dismissed this theory. For it to be believed, this court would have had to have found that a state court judge had knowingly conspired with SSB to transfer the Porsche to SSB for less than fair market value (and in violation of Article 9 of the UNIFORM COMMERCIAL CODE) so that the winner of an SSB employee "lottery" could drive the car as his or her personal vehicle.

The court's memorandum, however, went further and questioned HMC's and Chapman's role in the sanctionable conduct. The memorandum expressed the court's reasoning as to why HMC and Chapman might also be sanctioned. Acting under Rule 9011(c)(1)(B), the court then entered a separate order to show cause as to why HMC and Chapman ought not to be sanctioned as well. The order gave HMC and Chapman thirty days to respond.[16]

G.     *Response to Court's Order to Show Cause*

To say that HMC's and Chapman's response was one of outrage would be an understatement. Their joint response, filed April 29, 2005, described the language in the court's prior memorandum as "outlandish, improper, unfounded and boorish" as well as "false" and "reckless." The court's reasoning was based, HMC asserted, "on flimsy threads of inference and guess-work," and it exceeded the "reason and decorum expected of a judicial officer." For good measure, HMC stated that the prior memorandum was "offensive, distasteful, crude, untrue, and should never [have

---

[16]The court also required HMC to disclose all compensation paid to it related to the representation of Aston-Nevada, regardless of the sources, as HMC had not sought to be employed by the chapter 11 estate, and had not filed any information required by Rule 2016.

HMC's and Chapman's time to respond was extended because the court's docket and files contained out-dated information regarding HMC's address, thus causing the original order to show cause to be misdelivered. When the error was brought to the court's attention, the court extended the time within which HMC and Chapman had to respond to ensure that they each received at least 30 days to respond. This apparently ended the matter; the error in noticing was not raised as a defense at the June 2005 hearing.

been] issued by any judiciary or judicial officer administering equity and justice . . ."[17] There were other similar bellicose phrases.[18]

And there were even threats. HMC and Chapman cited 42 U.S.C. § 1983 in their brief, and stated that "the order of the Court that Respondents defend themselves is unconstitutional at best." In this regard, HMC asserted that the court "stepped outside of the 'judicial capacity' when it began to opine to such a degrading degree, without factual basis, and threatened Respondents with humiliation, degradation and monetary deprivation. . . . Any damage Respondents sustain as a result of this personal opinion, inside or outside judicial capacity, may spur action for recovery." HMS then dropped a footnote: "Investigation may even be entertained regarding judicial proceedings for ethical violations of judicial responsibilities for violations of such basic rules and constitutional rights."[19]

_____

[17]The quotation continues "without FIRST allowing a party to present itself before the tribunal and admit evidence and argument." HMC clearly misconstrued the memorandum as a final order, which was demonstrably wrong – the memorandum gave HMC thirty days to present its case, and held out the possibility that HMC could have a hearing on the issues depending on what its response indicated. Such a hearing was held, as is set forth below.

[18]The court's memorandum was also described as "very scathing, accusatory, variably based [*sic*] and soft-footed," and as containing "heinous, outlandish and mendacious arguments, allegations, implications and inferences." HMC concluded its response with this sentence: "This Court has demonstrated extreme disdain, rude and baseless accusations and possessed such intense disgust for Respondents, unrivaled in any of my known colleagues' practice of law." It stated that its representation of Aston-Nevada, Rogers, and LeVillier was "worthy of commendation and not reprimand."

[19]HMC also indicated that any monetary sanctions would be devastating to their firm. As Kurt Harris, the managing partner, stated in his declaration signed under penalty of perjury: "That the court is additionally intent upon leveling some form of monetary punishment which will operate to remove food from my children's mouths as well as the children of my partners." Upon

(continued...)

In addition to their written brief, HMC and Chapman were given the entire day of June 17, 2005, to introduce any additional evidence and testimony they desired. In this regard, they introduced the testimony of a former employer, and the testimony of two of the three partners in the firm, Kurt Harris and Scott Chapman. In stark contrast to the strident tone of their brief, the members of HMC appeared almost meek, in part because they appeared to believe that the court had already decided against them.[20] At the conclusion of the hearing, in order to permit Chapman or HMC to retract any of their statements or pleadings, the court asked the members of HMC and Chapman, "Is there anything else that you wish to add or subtract from the record?" The response, from Scott Chapman, on his behalf and on behalf of HMC, "Not that I can think of, your Honor."

### III. HMC's and Chapman's Errors of Professional Responsibility

The above is a long, albeit necessary, examination of the conduct of HMC and Chapman in this case. It is not a history that brings honor to the legal profession. It is a history, however, that presents at least two possible types of errors that could form the basis of sanctions: errors caused by representing a client whose case presented issues demonstrably beyond the capacity of the lawyers involved, and errors caused by crossing the line between zealous advocacy and bad-faith practice.

---

[19](...continued)
questioning at the June hearing, Harris testified that the partners of HMC earned approximately $140,000 each in 2004, and thus the statement appears to be somewhat overblown.

[20]Harris testified that at least one of his inappropriate statements – that the court was taking food out of the mouths of the children of HMC's partners – was animated by the belief that sanctions were a foregone conclusion. He testified, "I don't feel as though anything that I say here today is going to change the mind of the Court with regard to this."

13

### A.    Errors Caused by Inexperience

HMC's and Chapman's actions might be explained (but not justified) by Chapman's relative inexperience. He testified that neither he nor anyone at HMC had ever represented a chapter 11 debtor. As indicated above, he apparently didn't ask the questions that he should have when performing client intake. He failed to follow local rules regarding the need to obtain a hearing date.[21]  Although he testified that HMC had access to PACER, the court's electronic docket, he never consulted it. He never filed the necessary papers for HMC to be employed by Aston-Nevada and never filed any of the necessary financial disclosures. All of this could be read as improper actions taken in good faith by an inept and inexperienced litigator, out of his element in bankruptcy court.

### B.    Errors Caused by Inappropriate Practice

The court, however, does not view Chapman's (and derivatively, HMC's) actions in such a benign light. At the initial relief from stay hearing, Chapman knew enough to argue that SSB had violated the local rules regarding meeting and conferring about relief, and he had paperwork to back up the claim – paperwork that disclosed that Aston-Nevada had filed its bankruptcy to evade state court proceedings. He admitted that he had met with Rogers for about an hour before filing any pleadings. Yet, despite also admitting that HMC had access to PACER, he never consulted it to see what Aston-Nevada had filed. In short, Chapman took the information that he thought would give him a tactical advantage, and he turned a

---

[21]In addition to the initial application to dismiss, Chapman neglected to obtain a hearing date on HMC's post-sanctions motion to withdraw from representing Aston-Nevada, Rogers, and LeVillier.

1 blind eye to sources that could have supplemented and corrected positions he later
2 took.

3 Chapman asserts that filing the initial application to dismiss also shows a
4 lack of improper motive. Yet the initial application was so clumsily drawn, and so
5 ineptly pursued, that it raises at least two issues of good faith. The first is the obvious
6 issue of recklessness in engaging in a practice for which the attorney was woefully
7 unprepared. The second, and the one the court credits, is that the application was an
8 inelegant attempt to install an escape hatch in their representation, giving HMC an
9 excuse (which it has raised in these proceedings) that it was seeking to do the "right
10 thing" despite Rogers' instructions. The fact that the application was never served or
11 prosecuted lends support to this theory, as does the fact that it was so inept – it could
12 easily be explained away as a mistake if Rogers' position later required HMC to
13 disavow it. This reading of the evidence is also supported by the fact that Chapman
14 sought dismissal "without prejudice" – whatever that may mean in the context of a
15 bankruptcy case – despite the finding the court had made the day before that Aston-
16 Nevada's filing was in bad faith.

17 HMC's and Chapman's conduct with respect to the Rule 2004 examination
18 further supports the conclusion that HMC's and Chapman's actions were in bad faith.
19 When SSB obtained an order requiring Aston-Nevada's "person most knowledgeable"
20 to appear for an examination under Bankruptcy Rule 2004,[22] HMC pursued a course

21

22

23     [22]SSB obviously did not dream up the term "person most knowledgeable." It is the standard
designation under Rule 30(b)(6) of the FEDERAL RULES OF CIVIL PROCEDURE or Bankruptcy Rule 7026
24 for the appropriate person to testify on behalf of a party who is not an individual. *See* Mattel, Inc.
v. Walking Mountain Prod., 353 F.3d 792, 798 n.4 (9th Cir. 2003).
25

of action that was, at best, inconsistent with their now-stated aim of dismissal, and, at worst, an attempt to openly flout the order regarding the Rule 2004 examination.

The court's refusal to characterize HMC's and Chapman's actions as merely hapless is further supported by their collective reaction to the order to show cause. The court considered separately sanctioning the response, since it clearly contains inappropriate and sanctionable language, but instead chooses to view it as a part of HMC's and Chapman's general approach to litigation, an approach that is unacceptable under any reasonable view of modern lawyering.

As a result, the court discredits the testimony and arguments of HMC that Chapman and HMC were innocent pawns in Rogers' sanctionable behavior with respect to the Rule 2004 examination. Their conduct belies this theory. As set forth above, HMC, through Chapman, filed papers that pushed to the limit Rogers' theories of SSB's alleged persecution and conspiracy. They then obdurately refused to back down from any position taken in the case – beginning with the argument that the filing was necessary to reorganize Aston-Nevada and ending with the incendiary statements contained in their response to the order to show cause. From the moment they entered the case, HMC and Chapman pursued a bad-faith course of conduct, employing shameful tactics to achieve improper goals.

## IV. HMC's and Chapman's Procedural Arguments Against Sanctions

Amid the inappropriate language in their reply, HMC and Chapman make several legal arguments. They argue that this court deprived itself of jurisdiction over their actions when it dismissed the case subject only to SSB's sanctions motion. They also claimed that the process by which the sanctions were to be determined was procedurally improper, variously arguing that sanctions against them could not be

1    sought unless a formal complaint and adversary proceeding was initiated against

2    them, and that, in any event, there was no jurisdiction to investigate their actions.

3         *A.*    *Lack of Jurisdiction*

4        While  the order of dismissal did not expressly reserve the right for the court

5    to inquire into the conduct of HMC or Chapman, the court's order to show cause

6    impliedly, if not explicitly, kept the case open for the purpose of investigating the

7    propriety of further sanctions.  *See, e.g.,* Troost v. Kitchin (*In re* Kitchin), 327 B.R. 337,

8    362 (Bankr. N.D. Ill. 2005) ("a potential violation of Rule 9011 is complete when the

9    paper is filed. . . .  This means that sanctions may be awarded whether the plaintiff

10    wins, loses on the merits, or dismisses its own case.").[23]

11        It is also well-settled that a federal trial court may retain jurisdiction after

12    dismissal of a case for the limited purpose of adjudicating Rule 11 litigation, a ruling

13    easily applicable here given that Rule 9011 is an adaptation of Rule 11.[24]  *See* Cooter

14    & Gell v. Hartmarx Corp., 496 U.S. 384, 395 (1990); *In re* French Bourekas, Inc., 183 B.R.

15    695, 696 (Bankr. S.D.N.Y. 1995) (applying *Cooter* in a bankruptcy setting).[25]  Moreover,

16    

17        [23]Indeed, even if the case were considered closed, the court retains the power to reopen it.

18    *In re* Castillo, 297 F.3d 940, 944-45 (9th Cir. 2002); *In re* Elias, 215 B.R. 600, 604 (B.A.P. 9th Cir. 1997);
11 U.S.C. § 350(b).

19        [24]HMC also contends that this court would violate Bankruptcy Rule 9011(c)(2)(B) by imposing

20    monetary sanctions after the case was voluntarily dismissed.  The court agrees with HMC's reading
of the rule, but notes that the limited monetary sanctions imposed are issued under the court's

21    inherent power and not under Rule 9011.

22        [25] *French Bourekas* also contradicts HMC's contention that this sanctions proceeding is a non-

23    core matter over which this court has no jurisdiction.  183 B.R. at 696 ("[T]he power to sanction
parties for conduct in a core matter is itself core.").  *See also* Price v. Lehtinen (*In re* Lehtinen), 332 B.R.

24    404, 411 (B.A.P. 9th Cir. 2005) (stating in dicta that a sanction predicated on actions that occurred

                                                    (continued...)

25

the Supreme Court has stated that a federal trial court has the power to regulate practice before it even in the absence of subject matter jurisdiction. Willy v. Coastal Corp., 503 U.S. 131, 137-38 (1992); 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 1336, at 632 (3d ed. 2005).

HMC's and Chapman's procedural complaint – that the case was closed when the first sanctions order was entered – might carry some weight if opening or closing the case prejudiced their ability to defend their actions. HMC and Chapman, however, were given ample opportunity to present evidence, and they did indeed marshal a defense that consumed significant amounts of paper and court time. In this context, the court's inherent ability to regulate practice before it permits examination of their actions, and there can be no legitimate claim of prejudice or disabling impropriety arising from the simple failure to formally reopen the case.[26]

B.    *Nature of Procedure Used to Impose Sanctions*

The procedure employed by the court complied with Rule 9011 and with the reported decisions regarding sanctions under the inherent authority of the court. *See, e.g.*, Miller v. Cardinale (*In re* DeVille), 361 F.3d 539 (9th Cir. 2004); Polo Bldg. Group, Inc. v. Rakita (*In re* Shubov), 253 B.R. 540, 546 (B.A.P. 9th Cir. 2000); *In re* McCarthy, 312 B.R. 413 (Bankr. D. Nev. 2004); FEDERAL PRACTICE AND PROCEDURE: CIVIL, *supra*, at § 1337.3. The court raised its objections in writing, notified HMC and Chapman of the basis for the possible imposition of sanctions, and gave HMC and Chapman the

---

[25](...continued)
during a "representation of debtor in matters central to her case" was a core matter).

[26]Indeed, there was good reason for HMC to seek to reopen it so that they could comply with the bankruptcy rules with respect to compensation.

18

opportunity to respond, which they did.  The court also gave HMC and Chapman the opportunity to present evidence, which they also did.  As the court stated on the record at the hearing, nothing had been decided before HMC and Chapman had a full opportunity to present their case.

The court has also delayed deciding this matter in order to achieve a thoroughly objective review of the record.  The court is well aware of the consequence of imposing sanctions.

## V.  The Merits

All of this leads to the inevitable assessment of whether HMC's and Chapman's conduct violated the standards embodied in Rule 9011 or was sanctionable under a proper exercise of this court's inherent power to regulate the lawyers who practice before it.  It is to those tasks that this opinion now turns.

*A.    HMC's and Chapman's Violations of Rule 9011*

The core obligations of all who file or appear in bankruptcy court are set forth in Bankruptcy Rule 9011(b)(1)-(2):

(b) **Representations to the Court.**

By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,–

19

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law; . . . .

In short, "[a]n attorney's signature on a complaint is tantamount to a warranty that the complaint is well grounded in fact and 'existing law' (or proposes a good faith extension of the existing law) and that it is not filed for an improper purpose." Christian v. Mattel, Inc., 286 F.3d 1118, 1127 (9th Cir. 2002).[27]  *See also* Advisory Committee's Note to Rule 11 (as approved by the Standing Committee in 1993), *reprinted in* 146 F.R.D. 519, 584 (1993) ("The rule retains the principle that attorneys and pro se litigants have an obligation to the court to refrain from conduct that frustrates the purposes of Rule 1"); Vairo, *supra* note 27, at §§ 5.05[a][1], 10.03.

Under Rule 9011, the Ninth Circuit has expressed this duty as follows:

In determining whether sanctions are warranted under Rule 9011(b), we "must consider both frivolousness *and* improper purpose on a sliding scale, where the more compelling the

---

[27]Although *Mattel* construed Rule 11 of the FEDERAL RULES OF CIVIL PROCEDURE, Rule 9011 is based upon Rule 11, and there is sufficient identity between the two to warrant consultation of Rule 11 jurisprudence to interpret similar provisions of Rule 9011.  Klein v. Wilson, Elser, Moskowitz, Edelman & Dicker (*In re* Highgate Equities, Ltd.), 279 F.3d 148, 151 (2d Cir. 2002).  *See also* GEORGENE M. VAIRO, RULE 11 SANCTIONS: CASE LAW, PERSPECTIVES AND PREVENTATIVE MEASURES § 3.04[a] (3d ed., Richard G. Johnson, ed. 2003).

showing as to one element, the less decisive need be the showing

as to the other."

Dressler v. The Seeley Co. (*In re* Silberkraus), 336 F.3d 864, 870 (9th Cir. 2003)(emphasis in original), *quoting* Marsch v. Marsch (*In re* Marsch), 36 F.3d 825, 830 (9th Cir. 1994).  As the Bankruptcy Appellate Panel recently stated, "In considering sanctions under Rule 9011, the court measures the attorney's conduct 'objectively against a reasonableness standard, which consists of a competent attorney admitted to practice before the involved court.'" Smyth v. City of Oakland (*In re* Brooks-Hamilton), 329 B.R. 270, 283 (B.A.P. 9th Cir. 2005), *quoting In re* Grantham Bros., 922 F.2d 1438, 1441 (9th Cir. 1991).

Several actions taken by Chapman and HMC[28] in this case violated Rule 9011(b)(1) and (b)(2): opposing SSB's relief from stay motion; later advocating the inappropriate relief sought in the petition through opposing the relief from stay; and later advocating the inappropriate relief through statements made in support of the second motion to dismiss.

1.    Preliminary: The Inappropriateness of Filing the Petition

Even though HMC and Chapman were not hired until after Aston-Nevada filed, it is still important to understand the illegitimate nature of Aston-Nevada's filing

---

[28]Although the partners of HMC other than Chapman appear to have had no actual involvement before the court issued its order to show cause, it is settled law that the firm that the actual violator belongs to shares responsibility with the person who committed the sanctionable activity. *See* FED. R. BANKR. P. 9011(c)(1)(A); Miller v. Cardinale (*In re* DeVille), 361 F.3d 539, 548 (9th Cir. 2004).

21

since Chapman and HMC later advocated its propriety.[29]  In the Ninth Circuit, "'[f]rivolous' filings are those that are 'both baseless and made without a reasonable and competent inquiry.'"  Buster v. Greisen, 104 F.3d 1186, 1190 (9th Cir. 1997), *quoting* Townsend v. Holman Consulting Corp., 929 F.2d 1358, 1362 (9th Cir. 1990) (en banc). Aston-Nevada's filing satisfied this standard.  As indicated above, Aston-Nevada had no good reason to file chapter 11 bankruptcy.  It was a single-asset debtor with one secured creditor – SSB.  It had no unsecured creditors (unless you count SSB's deficiency claim).  It had no employees and no revenues and no hope for either. Aston-Nevada's filing was baseless.  It had every hallmark of an improper filing, and it had no saving grace.  *See, e.g.*, St. Paul Self Storage Ltd. P'ship v. Port Authority of St. Paul (*In re* St. Paul Self Storage Ltd. P'ship), 185 B.R. 580, 582-83 (B.A.P. 9th Cir. 1995); *In re* American Telecom Corp., 319 B.R. 857 (Bankr. N.D. Ill. 2005); *In re* McCarthy, 312 B.R. 413, 418-19 (Bankr. D. Nev. 2004).  *See also* William Thomas Thurman & Brett P. Johnson, *Bankruptcy and the Bad Faith Filing*, UTAH BAR J. 12, 14-15 (Dec. 1997).[30]

---

[29]This discussion is provided for background purposes.  None of the orders previously issued – including the order granting relief from stay and the order imposing sanctions on Aston-Nevada, Rogers, and LeVillier – has been appealed.  Neither Chapman nor HMC moved to amend the orders under FED. R. BANKR. P. 9023 (incorporating FED. R. CIV. P. 59) or to set aside the order under FED. R. BANKR. P. 9024 (incorporating FED. R. CIV. P. 60(b)).  These orders are thus final and the findings therein have issue preclusive effect in this matter.

[30]Determining the lack of good faith is not an investigation into the subjective motivation of the parties.  Rather, "'[g]ood faith' is a term of art. 'Though it suggests that the debtor's subjective intent is determinative, this is not the case. Instead, the 'good faith' filing requirement ... [is intended] to deter filings that seek to achieve objectives outside the legitimate scope of the bankruptcy laws.'" *In re* Liberate Technologies, 314 B.R. 206, 211 (Bankr. N.D. Cal. 2004), *quoting Marsch*, 36 F.3d at 828.

As a result of such patent lack of legal justification, not much in the way of improper purpose would have been necessary under either *Silberkraus* or *Marsch* to sanction Aston-Nevada and its principals according to Rule 9011. But Aston-Nevada's purpose in filing was just as malign as the frivolousness that motivated it. Rogers filed to avoid the consequences of the state court turnover action.  Filing a bankruptcy petition to evade such legitimate state court actions is a classic example of improper purpose, as well as of bad faith.  *In re Silberkraus*, 336 F.3d at 871; Chinichian v. Campolongo (*In re* Chinichian), 784 F.2d 1440, 1444-46 (9th Cir. 1986).

Based on this analysis, the court found in its earlier order that Rogers and LeVillier filed Aston-Nevada's petition for the sole purpose of delaying valid state court proceedings.  That is a highly improper purpose.  Marsch v. Marsch (*In re* Marsch), 36 F.3d 825, 830 (9th Cir. 1994); *In re* Collins, 250 B.R. 645, 656 (Bankr. N.D. Ill. 2000).   Indeed, it is a textbook example of a bad-faith filing, as this court found.

2.    The Opposition to the Relief From Stay, and "Later Advocating" the Improper Purposes Set Forth in the Petition

What were HMC's and Chapman's roles or responsibilities in this sequence of events?  They did not sign the petition, and so one might think that they bear no responsibility for it.  But Rule 9011 was changed in 1997 to cover not only signing documents, but also the "later advocating" of positions taken in prior documents that are known not to be well-taken.[31]

---

[31]At the time of the conduct discussed in this opinion, the Nevada Rules of Civil Procedure did not contain the "later advocating" language, but as of January 1, 2005, Nevada changed its Rule 11 to incorporate this provision.  Nevada Rule 11 now essentially mirrors federal Rule 11.  *See* Drafter's Note to 2004 Changes to Nevada's Rule 11 ("The rule is amended to conform to the federal

(continued...)

1   A review of the events underscores that HMC and Chapman strongly

2   advocated the position inherent in Aston-Nevada's frivolous and sanctionable

3   petition.  In both the response to the relief from stay motion and in the motion to

4   dismiss, HMC touted the propriety of the actions of Aston-Nevada and its

5   confederates, and it thus advocated the propriety of the initial filing.  In making these

6   arguments, HMC repeatedly, knowingly, and improperly used the plural terms

7   "creditors," "debts," and "assets," although it knew, since Aston-Nevada's schedules

8   and the court's initial order were clear on this point, that there was only one creditor,

9   one debt, and one asset.  Chapman and HMC could easily have checked on this by

10  obtaining a copy of the petition and schedules, either directly from Rogers or through

11  the PACER system.[32]  Indeed, Chapman and HMC affirmatively misled the court by

12  promising in their response to the relief from stay motion that "an exhaustive search

13  for all debts and assets is being performed and an amended petition may be

14  forthcoming."  Finally, HMC joined with Rogers in suggesting a sale of the Porsche

15  by a bankruptcy trustee, but then never took any steps to have a trustee appointed.[33]

16

17  [31](...continued)
rule, as amended in 1993, in its entirety.")  Of course, Rule 9011 adopted the 1993 amendments in

18  1997, and so the "later advocating" language has been in effect in bankruptcy court for the last eight
years.  See 1997 Notes of Advisory Committee on Bankruptcy Rules ("This rule is amended to

19  conform to the 1993 changes to F.R.Civ.P. 11.")

20  [32]Chapman conceded that although he had PACER access, he did not consult it before filing

21  his opposition.  See In re Oliver, 323 B.R. 769 (Bankr. M.D. Ala. 2005) (lawyer sanctioned under Rule
9011 for not checking PACER before filing bankruptcy case for client that had been enjoined from

22  future filings).

23  [33]If HMC did advise Rogers to dismiss the case after being told the facts, HMC should never

24  have filed an opposition to SSB's relief from stay motion.  Indeed, the court entertains serious doubts
(continued...)

25

This "later advocating" of the propriety of Aston-Nevada's chapter 11 case was an abdication of professional responsibility. HMC's and Chapman's prevarications and misstatements were deliberate and not careless. They were part of a concerted effort to delay the inevitable through pettifoggery and evasion. In short, their misrepresentations were designed to mislead the court. For the reasons set forth above, each of them independently constitutes a violation of Rule 9011.

Even if HMC had not affirmatively misled the court, its conduct nonetheless violated Rule 9011. In particular, when HMC learned of the meager facts related to Aston-Nevada and its filing, it should have declined to file an opposition. And these facts could have (and should have) either come out during the initial client consultation or soon thereafter by checking PACER for Aston-Nevada's docket information. Instead, Chapman and HMC took the passive approach to client representation, that of doing anything and everything the client requests, regardless of its questionable nature.

This a lawyer may not do. Model Rule 3.1 of the American Bar Association's Model Rules of Professional Conduct states:

> A lawyer shall not bring or defend a proceeding, or assert or
> controvert an issue therein, unless there is a basis in law and fact
> for doing so that is not frivolous, which includes a good faith

---

[33](...continued)

as to whether any ethical law firm would have consented to represent Aston-Nevada for any purpose other than dismissal. "The rule continues to require litigants to "stop-and-think" before initially making legal or factual contentions." Fed. R. Civ. P. 11 Advisory Committee's Note (as approved by the Standing Committee in 1993), *reprinted in* 146 F.R.D. 519, 585 (1993).

argument for an extension, modification or reversal of existing law. . . .[34]

This rule requires a lawyer to exercise independent judgment with respect to claims a client wishes to bring and to decline to pursue claims that are frivolous. As indicated in a leading treatise:

> [A] lawyer's duty to refrain from making frivolous contentions will result in conflict with the client if the client insists that the contentions nevertheless be made. When such conflicts arise, Model Rule 3.1 and practice rules such as Rule 11 of the Federal Rules of Civil Procedure dictate that the interests of the fair administration of justice must be given priority over the client's desires.

2 GEOFFREY C. HAZARD, JR. & W. WILLIAM HODES, THE LAW OF LAWYERING § 27.13, at p. 27-27 (3d ed. 2004). As a result, when HMC met or discussed Aston-Nevada with Rogers, it should have known that filing a chapter 11 case for such a single-asset debtor was frivolous, and it should have refrained from representing Aston-Nevada or filing any further documents that justified Aston-Nevada's filing. If there was any

---

[34]Rule 170 of the Nevada Supreme Court Rules is identical. The *Restatement of The Law Governing Lawyers* is similar:

> A lawyer may not bring or defend a proceeding or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous, which includes a good-faith argument for an extension, modification, or reversal of existing law.

RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 110(1) (2000).

doubt about Aston-Nevada, Chapman could have independently confirmed its status on PACER.  Again, to quote Hazard & Hodes:

> If the lawyer carries out the client's instruction after becoming aware of the frivolous nature of the contentions, both the lawyer and the client can be civilly liable for sanctions under FRCP Rule 11, as well as subject to the exercise of the court's inherent supervisory powers.

*Id.*

To act on such frivolous claims, then, without independent investigation, was to succumb to the so-called "butler-style" of representation, under which the sequaciously servile lawyer does whatever the client wants and then cites that client's command as a shield to the improper actions.  This style of lawyering, however, has no place in bankruptcy court or, for that matter, in any court.  Rule 9011(b)(2) requires that "the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law."  No facts existed that could have made a filing by a one-asset, one-creditor, entity such as Aston-Nevada "warranted," especially when that one creditor was undersecured.  There were no creditors to protect, and thus no need for a collective action, and there was no equity in the one asset for the debtor after the creditor's claim was paid.  In such a case, all actions other than seeking dismissal were part and parcel of the unlawful activity that started with filing the petition.

This conduct runs afoul of Rule 9011.  It is the *presentation* of a claim or contention, whether by signing it or later advocating it, that triggers Rule 9011.  *See*

*Vairo, supra* note 27, § 1.08[e][1][B][i], at 28-29.   Under the terms of Rule 9011, presentation occurs "by signing, filing, submitting, or *later advocating*[] a petition . . ." BANKR. R. 9011(b)(1) (emphasis added).  *See also* Vairo, *supra* note 27, §§ 4.02[d], 4.02[e][5];  Buster v. Greisen, 104 F.3d 1186, 1190 n.4 (9th Cir. 1997) (violation of Rule 11 to advocate in federal court the propriety of baseless statements made in state court complaint that had been removed to federal court); O'Brien v. Alexander, 101 F.3d 1479, 1490 (2d Cir. 1996) (violation of Rule 11 to make misleading statements in oral argument that relate directly to a particular representation contained in a prior document that lawyer was then advocating).

Thus, even though neither HMC nor Chapman signed the petition, by later advocating its propriety and legitimacy they made the requisite presentation to the court.   Because Aston-Nevada's petition lacked any saving grace, this   "later advocating" of the propriety of Aston-Nevada's petition in the relief from stay motion and the motion to dismiss was the same as if HMC and Chapman had signed it themselves.  *See O'Brien*, 101 F.3d at 1490.  HMC and Chapman thus violated Rule 9011.

     *B.*     *HMC's and Chapman's Bad Faith Behavior and the Rule 2004 Examination*

HMC's conduct with respect to the Rule 2004 examination of Aston-Nevada's "person most knowledgeable" did not involve signing any pleading with the court.  As such, their conduct with respect to that examination does not come within the ambit of Rule 9011.  In short, neither HMC nor Chapman "present[ed] to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper . . . ."  Without such a predicate act, there is no violation of Rule 9011.

28

1.      The Court's Inherent Power

The unavailability of Rule 9011 does not mean that HMC and Chapman cannot be sanctioned for their actions surrounding the Rule 2004 examination.  As set forth above, in the Ninth Circuit, bankruptcy courts have the inherent power to punish contempts of their orders.  Miller v. Cardinale (*In re* DeVille), 361 F.3d 539 (9th Cir. 2004); Caldwell v. Unified Capital Corp. (*In re* Rainbow Magazine, Inc.), 77 F.3d 278 (9th Cir. 1996).[35]

This inherent power to punish, however, differs from the power to sanction under Rule 9011.  Only actions taken in bad faith may be punished under the court's inherent power.  *DeVille*, 361 F.3d at 548; *Brooks-Hamilton*, 329 B.R. at 287; Fjeldsted v. Lien (*In re* Fjeldsted), 293 B.R. 12, 26 (B.A.P. 9th Cir. 2003).  *See also* Barber v. Miller, 146 F.3d 707, 711 (9th Cir. 1998) ("[a]n award of sanctions under . . . the district court's inherent authority requires a finding of recklessness or bad faith.").  By contrast, the imposition of sanctions under Rule 9011 requires only a showing of "objectively unreasonable conduct."  *DeVille*, 361 F.3d at 548, *quoting* Fellheimer, Eichen & Braverman v. Charter Technologies, 57 F.3d 1215 (3d Cir. 1995).

---

[35]Indeed, outright contempt need not be proved.  The Ninth Circuit has stated that it is:

clear that sanctions are available if the court specifically finds bad faith or conduct tantamount to bad faith.  Sanctions are available for a variety of types of willful actions, including recklessness when combined with an additional factor such as frivolousness, harassment, or an improper purpose. Therefore, we hold that an attorney's reckless misstatements of law and fact, when coupled with an improper purpose, such as an attempt to influence or manipulate proceedings in one case in order to gain tactical advantage in another case, are sanctionable under a court's inherent power.

Fink v. Gomez, 239 F.3d 989, 994 (9th Cir. 2001).

1    Further, the violations of the order must be shown by clear and convincing

2    evidence.  Knupfer v. Lindblade (*In re* Dyer), 322 F.3d 1178, 1190-91 (9th Cir. 2003)

3    (sanctions in context of violation of automatic stay).  *See also* Hansbrough v. Birdsell

4    (*In re* Hercules Ent., Inc.), 387 F.3d 1024, 1028 (9th Cir. 2004) (adopting *Dyer* in the

5    context of refusal to testify at Rule 2004 examination).  Finally, before sanctions may

6    be imposed, those being sanctioned must have an opportunity to defend their actions.

7    *DeVille*, 361 F.3d at 548-49.  That opportunity was afforded here through the briefing

8    schedule and by offering Chapman and HMC one day of court time to present any

9    relevant evidence they wished.

10    2.    Subverting the Court's Rule 2004 Examination Order

11    Despite the opportunity to show otherwise, HMC and Chapman failed to

12    demonstrate that their conduct with respect to the Rule 2004 examination was

13    anything other than in bad faith.  Chapman had in his possession an order requiring

14    Aston-Nevada's "person most knowledgeable" to appear for an examination under

15    Bankruptcy Rule 2004. The order set the scope of that examination broadly, indicating

16    it would extend to the following:

17           Acts, conduct or property of the debtor, or to any

18           matter which may affect the administration of the

19           debtor's estate, or to its right to discharge, and acts,

20           conduct, or property of the debtor that relate to the

21           liabilities and financial condition of the debtor, the

22           source of any money or property acquired or any

23           other matter relevant to the case.

24

25

The order also required production of documents "relating to the 1999 Porsche . . . including, but not limited to, registration papers, insurance, location, etc."[36]

This order was clear and definite, especially as to the knowledge the person to appear had to have; indeed, given the ownership of Aston-Nevada, the order could have just as easily referred to Rogers by name. *Cf. In re Dyer*, 322 F.3d at 1190-91 ("'The standard for finding a party in civil contempt is well settled: The moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court. . . . In determining whether the contemnor violated the stay, the focus 'is not on the subjective beliefs or intent of the contemnors in complying with the order, but whether in fact their conduct complied with the order at issue.'").

As Aston-Nevada had only one asset – the Porsche – and no revenue, no employees, and no business plan, the only reasonable conclusion would be that the person driving the Porsche and keeping it under his control – Rogers – should have appeared. But he didn't. Instead, LeVillier was sent, ostensibly because he had been familiar with Aston-Nevada when it actually had assets and a purpose. But that part of Aston-Nevada's corporate life was long past, and was of no relevance to Aston-Nevada's 2004 filing. LeVillier had had no dealings with Aston-Nevada in more than

---

[36]This part of the order was technically improper, although no party objected. In 2002, Bankruptcy Rule 2004 was amended by deleting the provisions permitting a court to order the production of documents. In the place of a court order, Rule 2004(c) was changed to require those who wish to compel the production of documents to issue or obtain a subpoena for such documents in accordance with Bankruptcy Rule 9016 (which incorporates Rule 45 of the FEDERAL RULES OF CIVIL PROCEDURE).

a year. LeVillier did not know where the Porsche was, and he did not bring anything related to insurance or registration.[37]

Chapman contends that because counsel for SSB had told him that there would be no more continuances after the one that had already been granted, he went forward with the examination because he believed that any opposition would be futile. On that basis, Chapman and HMC contend that Chapman was justified in showing up with whomever the client designated and proceeding with the examination. This is a complete abdication of Chapman's and HMC's responsibilities as attorneys and constitutes further evidence of their bad faith. "Following orders" of a client or a superior or employer is no defense to filing a pleading in bad faith or for an improper purpose. *See, e.g.*, NCNB Texas Nat'l Bank v. A.S.M., Inc. (*In re A.S.M., Inc.*), 110 B.R. 802, 806 (Bankr. W.D. Tex. 1990) ("Counsel is not immune merely because he or she was following the client's instructions."); *In re* Chicago Midwest Donut, Inc., 82 B.R. 943 (Bankr. N.D. Ill. 1988).

Professionally responsible attorneys would not have allowed their client to continue to involve them in a scheme to frustrate SSB. At a minimum, HMC and Chapman should have told Aston-Nevada that HMC and Chapman were not prepared to go forward under those conditions and that Aston-Nevada's decision to send LeVillier was unacceptable. They should have then halted the examination, and tried to defend Aston-Nevada or, if Aston-Nevada's actions were indefensible, they should have moved to withdraw from the representation.

---

[37]The testimony is reprinted above in note 14.

Instead of taking this position, they compounded their error by going forward with the examination. They then continued to attempt to justify their actions long after their insufficiency was shown. Again, since Aston-Nevada had virtually no assets or operations (and since HMC had recognized this in its motion to dismiss), and since LeVillier had no familiarity with that one asset, the dissembling inherent in proffering and defending LeVillier as the "person most knowledgeable" for Aston-Nevada is apparent.

As indicated above, HMC should have insisted that Rogers appear or sought a second continuance when Rogers failed to appear at the continued examination. To permit Aston-Nevada to proffer LeVillier as the "person most knowledgeable" was to actively flout a specific court order under circumstances in which HMC should have, and undoubtedly did, know better.[38]  Indeed, if the law firm didn't know better, it has no business practicing law.  *Cf.* Primus Auto. Fin. Servs., Inc. v. Batarse, 115 F.3d 644, 648 (9th Cir. 1997) ("a finding of bad faith is warranted where an attorney 'knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent'").

----

[38]HMC argued that the Rule 2004 order was indefinite.  The following excerpt from their brief in opposition to sanctions shows the vacuity of their argument:

> The biggest complaint that Silver State makes in their Motion for Sanctions with regard to the 2004 Examination is that LeVillier did not know the exact location of the "moving" vehicle.  Not to mince words, but that really is impossible, as it is a moving item.

The order did not require knowledge of the Porsche's location with the precision of a global positioning system.  Putting forward this argument – which shares more in common with Heisenberg's uncertainty principle than a cognizable sanctions defense – further illustrates the bad faith conduct of HMC.

The facts thus show that HMC and Chapman knowingly violated this court's order concerning the Rule 2004 examination. Worse, they apparently jointly conspired to proffer facial compliance with that order in a manner that only multiplied the cost to SSB (they did send someone, and that someone had dealt with Aston-Nevada in the past). The court order required production of the "person *most* knowledgeable," not anyone with some knowledge. Rogers was the only person who had the required information, and by failing to insist on his attendance, HMC and Chapman engaged in actions that actively scoffed at the court's authority. This bad faith conduct is sanctionable.

The record before the court indicates that HMC is equally responsible with Aston-Nevada, Rogers, and LeVillier for sanctionable behavior. Given the stark simplicity of the facts of this case and the actions that were taken, the court is at a loss to develop any legitimate justification for Chapman's or HMC's conduct. The firm had a full opportunity to brief the propriety of the actions of their client and of Rogers and LeVillier. Presumably, HMC's and Chapman's arguments and actions in defense of their clients would be no different than their defense of the same actions on their own behalf. At the end of the day, the evidence points to an overly aggressive firm, which recklessly took on a client without proper training and without proper investigation, and then defended that client's unsupportable positions well beyond the point of proper advocacy.

## VI. Sanctions

To review, HMC and Chapman violated Rule 9011 by "later advocating" the purposes of the petition by signing the opposition to SSB's relief from stay, by signing the motion to dismiss, which attempted to defend the indefensible position that Aston-

34

Nevada had filed for a proper purpose, and by defending Aston-Nevada, Rogers, and LeVillier with respect to SSB's sanctions motion.  HMC and Chapman also violated Rule 9011 by making affirmative misrepresentations in the opposition to SSB's motion for relief from stay and in the response to SSB's motions for sanctions.[39]  Finally, HMC and Chapman also flouted in bad faith this court's order regarding the Rule 2004 examination, and this court's inherent power allows it to sanction that conduct.

>  A.    *Monetary Sanctions Against HMC and Chapman*

The court acknowledges that, given the procedural context of this matter, monetary sanctions are not appropriate under Rule 9011.  That rule does not permit fee shifting of the cost of litigation, Chase v. Kosmala (*In re* Loyd), 304 B.R. 372, 374 (B.A.P. 9th Cir. 2005), and Rule 9011(c)(2)(B) specifically limits the court's ability to enter sanctions if a dismissal has been entered.

But nonpunitive monetary sanctions may be awarded under the court's inherent power to regulate practice before it.  *Cf.* Miller v. Cardinale (*In re* DeVille), 361 F.3d 539, 553 n.9 (9th Cir. 2004) (sanctions under inherent power may be aimed at deterrence without necessity of invoking strict procedural protections afforded by a criminal contempt proceeding); Price v. Lehtinen (*In re* Lehtinen), 332 B.R. 404, 412 (B.A.P. 9th Cir. 2005) (noting that the inherent power of the court permits monetary sanctions when award would be "either compensatory or . . . designed to coerce compliance").  In this context the principles guiding the formulation of sanctions

---

[39]In their response to the motion for sanctions, HMC continued to press Rogers' conspiracy theory as justification for the filing, citing an article in a local paper regarding the repossession as proof that SSB had a vendetta against Rogers (although no proof of anything other than the article's existence was offered).  It again stated the purpose in filing was to bring in a neutral trustee, although as indicated in text, HMC never made any request for a chapter 11 trustee.

should be the same as for Rule 9011: sanctions should be "limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated." FED. R. BANKR. P. 9011(b)(2). *See* Knupfer v. Lindblade (*In re* Dyer), 322 F. 3d 1178, 1193-94 (9th Cir. 2003) (noting that the "inherent sanction authority allows a bankruptcy to deter and provide compensation for a broad range of improper litigation tactics").

In determining the proper sanction, the court acknowledges that it previously ordered $12,108.50 in sanctions to be paid to SSB. This amount represented SSB's attorneys' fees in Aston-Nevada's case. As the Ninth Circuit has said:

> A restitutionary award compensating the opposing party for
> unnecessary litigation expenses – as opposed to a punitive fine
> paid to the court – is a particularly appropriate sanction in cases
> involving manipulative petitions filed principally for purposes of
> delay and harassment.

Marsch v. Marsch (*In re* Marsch), 36 F.3d 825, 831 (9th Cir. 1994).

As this court earlier found, disobeying the court's order for examination of the "person most knowledgeable" under Rule 2004 caused SSB to incur excess fees and costs. SSB's costs and attorneys' fees related to much of the chapter 11 filing were therefore completely avoidable. HMC and Chapman should thus be jointly and severally liable with their former clients for that portion of SSB's attorneys' fees caused by Chapman's and HMC's actions in defending the Rule 2004 examination and for their actions that led to SSB's sanctions motion. That amount is $9,640.[40] It is fitting

---

[40]This total is taken from HMC's opposition to SSB's original sanctions motion, filed
(continued...)

that Chapman and HMC share in the obligation to compensate SSB for their client's

bad faith actions.  This sanction should assist the court in deterring future similar

misconduct by other firms.[41]

> B.    *Additional Sanctions Against HMC and Chapman*

> 1.    Nonmonetary Sanctions

Should there be additional sanctions?  Again, Rule 9011 states that "[a]

sanction imposed for violation of this rule shall be limited to what is sufficient to deter

repetition of such conduct or comparable conduct by others similarly situated." FED.

R. BANKR. P. 9011(c)(2).  Similarly, actions sanctionable under the court's inherent

powers work best when they compensate the harm caused or deter repetition of the

sanctionable conduct.  *In re* Dyer, 322 F.3d at 1190-91; Gregory v. Depte, 896 F.2d 31,

34-35 (3d Cir. 1990).

Although the court has found HMC and Chapman to be jointly and severally

liable for some of SSB's fees and costs under the analysis above, this may not be a

sufficient deterrent to them or to others similarly situated, especially if HMC's clients

have already paid SSB.  As noted recently:

> Apparently, the existence of Rule 9011 alone has not had much of
>
> a deterrent effect for general and nonbankruptcy practitioners,
>
> some of whom apparently hold an all-too-widespread belief that
>
> a bankruptcy case is a panacea for state court litigation that has

--------

[40](...continued)
November 24, 2004.

[41]If the sanctions have already been paid, no further payment is required. The court expresses
no opinion on any contribution or equitable indemnity actions among those liable for the sanctions.

> gone awry in spite of Congress's limited intent for the bankruptcy
> regime. . . . This distorted picture of the Bankruptcy Code then
> spreads to *pro se* litigants.

*In re* American Telecom Corp., 319 B.R. 857, 874 (Bankr. N.D. Ill. 2005). The court fears

that HMC has contributed to this false characterization of bankruptcy by its meritless

and misleading response to the motion to lift the automatic stay and by its continued

assertions that Aston-Nevada's filing was perfectly appropriate.

  Under Rule 11, courts have ordered a wide array of sanctions, including

fines, attorneys' fees and costs, disgorgement of fees charged for the sanctionable

activity, mandatory legal education, and referrals to disciplinary bodies.[42] Vairo, *supra*

note 27, at 566-74. *See also* AMERICAN BAR ASS'N, STANDARDS FOR IMPOSING LAWYER

SANCTIONS (as amended, 1991).[43] In its selection of sanctions, the court has taken into

---

[42]Some orders have been laced with sanctions that only tangentially deter: At least one court has ordered counsel to write in longhand, "In the future I will carefully comply with all provisions of Rule 11" one hundred times. Vairo, *supra* note 27, at 580.

[43]In formulating the sanctions assessed, the court has studied the American Bar Association standards as required by the Bankruptcy Appellate Panel. Price v. Lehtinen (*In re* Lehtinen), 332 B.R. 404, 415-16 (B.A.P. 9th Cir. 2005). The standards set forth four factors: 1. Whether the duty violated was to a client, the public, the legal system, or the profession; 2. Whether the lawyer acted intentionally, knowingly, or negligently; 3. Whether the lawyer's misconduct caused a serious or potentially serious injury; and 4. Whether there are aggravating and/or mitigating factors.

Here, the duty violated ran to the legal system and the profession. As set forth in text, the court finds that the sanctionable activities were intentionally and knowingly done. The injury caused here was slight, especially since HMC's client has already been ordered to pay SSB its fees and costs.

As to aggravating and mitigating factors, HMC puts forward its reputation and naivete as mitigating factors, but the court does not give any credit to its explanation, in large part because of
(continued...)

38

account HMC's written response to this court's order to show cause, which HMC cast in splenetic and threatening terms.  From this, the court concludes that HMC's attorneys care more about the mercantile qualities of the practice of law than they do about their professional obligations to their clients, to the public, and to the courts.[44]

Against this background, the character of the violations is troubling, especially for other firms that may be tempted to act as HMC and Chapman have acted in this case.  HMC, through Chapman, took steps no law firm should take and scoffed at rules in a spirit of gamesmanship that is inappropriate for an officer of this court.  The notion that any action requested by a client should be taken so long as some argument, no matter how tenuous, can be made for it, has a corrosive effect.  If unchecked, it spreads in the form of "tit-for-tat" reciprocity that lowers the level of practice, and multiplies litigation needlessly.

Thus, in addition to the monetary sanctions set forth above, the court will order three forms of nonmonetary sanctions:

- First, HMC and Chapman will receive a public reprimand in the form of the publication of this opinion in West's BANKRUPTCY REPORTER and in other collections of bankruptcy court opinions.  *See* ABA

---

[43](...continued)
the aggravating factor of its inappropriate written response to this court's order to show cause. Several times in its response, and during the hearing on June 17, HMC and Chapman contended that they did nothing wrong.  Indeed, throughout this process they have consistently maintained that their representation of Aston-Nevada deserved commendation, not condemnation.

[44]At the June 2005 hearing, Kurt Harris indicated that HMC had been more careful in their client intake due to this case, but then lamented that this move had hurt HMC's cash flow.

STANDARDS, *supra*, at § 4.53; William W. Schwarzer, *Sanctions Under the New Federal Rule 11 – A Closer Look*, 104 F.R.D. 181, 201 (1985).

● Second, to the extent that any credit can be given to HMC's and Chapman's testimony that the errors made were a result of youth and inexperience, such errors must not be repeated. Since the attitudes represented by Chapman's work appear to pervade the ethos of HMC, as shown by its response to the order to show cause, the court will order that no attorney associated with HMC as of the date of the order to show cause may make any appearance or file any document with the Bankruptcy Court for the District of Nevada unless that attorney first: (i) files a declaration stating that, during the twenty-four months immediately preceding the desired filing or appearance, the person has: (A) taken eight hours of continuing legal education regarding the practice of bankruptcy; (B) taken at least four hours of continuing legal education regarding ethics or professional responsibility; *and* (ii) attaches to the declaration, for filing in the case in which the person desires to appear, (A) a copy of this opinion; and (B) a copy of the brochure or other similar writing indicating the scope of the continuing legal education program attended. *See* ABA STANDARDS, *supra*, at § 2.8. This restriction will last for five years from the date of entry of this opinion, and it will be automatically renewed for another five years from that date unless HMC or Chapman file papers requesting to be relieved of the restriction that demonstrate why the restriction should be lifted.

40

●     Finally, the court notes from reading HMC's correspondence submitted as part of the record that HMC maintains a website that lists various areas of expertise (www.702law.com). Given all that has been discussed in this opinion, it is this court's finding that bankruptcy is not among the areas of expertise of HMC or Chapman, and it should not be an area of advertised practice until HMC's attorneys, including Chapman, obtain more training. As a result, it is this court's order that HMC may not list bankruptcy as a specialty or as an area of practice on its website or in other promotional material unless and until at least one partner of the firm meets the continuing education requirements set forth in the immediately preceding paragraph. *See* ABA STANDARDS, *supra* at § 4.52, & commentary thereto.

It is the court's judgment that a sufficient deterrent can be achieved only by combining these multiple forms of sanction – the liability for SSB's fees, the reprimand, the instruction of HMC's attorneys as to what conduct to avoid, and the limitation on false advertising. *See, e.g.,* Barnett Bank of Tampa, N.A. v. Muscatell (*In re* Muscatell), 116 B.R. 295 (Bankr. M.D. Fla. 1990); Vairo, *supra* note 27, at 573-74.

2.     Further Proceedings

This court has the power to regulate the fees charged by attorneys who work for the bankruptcy estate. 11 U.S.C. § 329(a). Various rules and procedures govern this relationship. *See, e.g.,* FED. R. BANKR. P. 2014-2016. As far as the court can tell,

41

however, HMC complied with none of these rules.[45]  HMC never filed a Rule 2016

statement or an application for employment, even after it was explicitly warned that

it had a duty to do so.  Given the facts recited above, this court finds that this conduct

is not benign, and the court further finds that it is part and parcel of the bad faith with

which HMC and Chapman pursued Aston-Nevada's case.

Failure to comply with these rules, however, does carry other consequences.

Bankruptcy courts have the power to require disgorgement of all fees paid by or for

the debtor if the mandatory disclosures are not made.  11 U.S.C. § 329.  "The

disclosure requirements imposed by § 329 are mandatory, not permissive, and an

attorney who fails to comply with the disclosure requirements forfeits any right to

receive compensation."  Peugeot v. United States Trustee (*In re* Crayton), 192 B.R. 970,

976-81 (B.A.P. 9th Cir. 1996).  *See also* Half v. United States Trustee (*In re* Basham), 208

B.R. 926, 931 (B.A.P. 9th Cir. 1997).

In its order to show cause, the court put HMC on notice of these provisions

and their mandatory nature.  HMC has chosen to ignore them.  HMC did, however,

disclose that HMC received $2,384.87 from Rogers for representing Aston-Nevada.

---

[45]In the order to show cause, the court separately required HMC to disclose the source of its fees for representing Aston-Nevada.  In its responsive submission, HMC (through Kurt Harris) objected to disclosing fees received from Rogers, stating, "I believe the disclosure to violate attorney-client confidentiality taught to me in law school."  No authority other than law school training was cited.  Regardless of what Harris recalls from law school, the courts and Congress have consistently held that disclosure of such compensation not only is consistent with the rules of attorney-client relationships, but is mandatory.  *See* United States v. Bauer, 132 F.3d 504, 509 (9th Cir. 1997) (identity of bankruptcy client, amount of fee and general purpose of work not subject to attorney-client privilege); United States v. White, 950 F.2d 426 (7th Cir. 1991) (information given to lawyer for use in schedules not privileged); 11 U.S.C. § 329(a).

It alleges that it is owed much more.  Nevertheless, *Crayton* and *Basham* compel disgorgement of those fees.

It would appear, however, that any disgorgement of fees would, paradoxically, create property of Aston-Nevada's estate.  But as Aston-Nevada had no property other than the over-encumbered Porsche, returning the fees to Aston-Nevada would serve no useful purpose; as SSB has obtained the Porsche and an award of sanctions, there are no creditors.  Disgorgement to the debtor would effectively force HMC to pay Rogers (the ultimate owner of Aston-Nevada).  This would in turn have the effect of unduly and improperly compensating Rogers, whose conduct was previously sanctioned by this court, and would actively frustrate the previous sanctions imposed on him by this court.

But HMC cannot retain the funds without complying with the Bankruptcy Code and Rules, especially after they have been given warnings and opportunities to comply, and then have refused to do so.  Thus, the court orders the immediate disgorgement of all fees received to represent Aston-Nevada into this court's registry.  As an alternative, with the prior approval of the court, HMC may pay the amount of the fees to any recognized program providing legal services to people who could not otherwise afford them, such as Clark County Legal Services or Nevada Legal Services.

### VII. Conclusion

HMC and Chapman, who had no background or training in chapter 11, agreed to represent a client who had no business being in bankruptcy.  They compounded their error by knowingly and in bad faith advocating that client's untenable position, by flouting an order of this court for the examination of the debtor, and by refusing to adhere to the rules regarding representation of bankruptcy estates.

43

For this they will be sanctioned as set forth above with a combination of public reprimands, admonishments, and educational requirements.

This court is saddened by the necessity of this action. Indeed, the fact that more than a year has passed between the acts complained about and this decision is evidence of the difficulties inherent in determining the proper response to HMC's and Chapman's actions, and in fashioning sanctions that are not punitive. The court hopes that these sanctions will lead to compliance with the rules of this court, the Bankruptcy Code, and the legal profession.

Ethical and professional representation of clients is essential to the ideals contained within our legal system. When lawyers cross the lines set by Rule 9011 and by other guidelines, their actions must be addressed, and addressed in a manner that will, in the words of Bankruptcy Rule 9011, "deter repetition of such conduct or comparable conduct by others similarly situated." That has been the goal in crafting the sanctions set forth in this opinion.

This opinion will constitute the court's findings of fact and conclusions of law under FED. R. BANKR. P. 7052. A separate order finding HMC jointly and severally liable for the amount of the sanctions set forth above, and imposing the nonmonetary sanctions also set forth above, will be entered under FED. R. BANKR. P. 9021.

Copies sent to:

Kurt K. Harris
kharris@702law.com

Jason A. Imes
bkfilings@s-mlaw.com

Jeanette E. McPherson
jmcpherson@s-mlaw.com bkfilings@s-mlaw.com

1

Scott E. Chapman
schapman@702law.com
2

10120 S. Eastern Ave. #200
Henderson, NV 89052

3

4                                              # # #

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25